Thomas F. **CRISMON,** Plaintiff and Appellant,

v.

The **WESTERN COMPANY OF NORTH AMERICA,** a Delaware corporation, Defendant and Respondent.

No. 860121–CA.

Court of Appeals of Utah.

Sept. 11, 1987.

---

Walter P. Faber, Jr., David J. Hodgson, Watkins & Faber, Salt Lake City, for plaintiff and appellant.

John R. Anderson, Beaslin, Nygaard, Coke & Vincent, Vernal, for defendant and respondent.

Before GREENWOOD, ORME and BILLINGS, JJ.

## OPINION

GREENWOOD, Judge:

Plaintiff Crismon appeals the trial court's judgment of no cause of action after the court found that a binding lease was not formed between the parties.

Sometime before December, 1981, Crismon began building duplexes on five lots (4, 5, 6, 7 and 8) in Vernal, Utah. As of December, 1981, construction was ninety percent complete on lots 4 and 5, and foundations had been installed on lots 6, 7 and 8.

In about mid December, 1981, Crismon met with Joe Eppes, manager of housing for the Western Company of North America (Western), to discuss leasing Crismon's duplexes. Western, an oil field service company, needed housing for its employees in Vernal, Utah. On January 11, 1982, Eppes sent Crismon a letter stating:

> Western ... will enter into a lease agreement on five (5) duplexes....
>
> ....

The basic term of agreement is that Western shall enter into a five (5) year lease payable $540. per unit per month with a 6% annual escalation clause....

Lessor shall be responsible for basic maintenance and management of said units.

I am having our Legal Department prepare a lease based on the general agreements.

On January 15, 1982, Western began paying rent on the two completed units.[1] On February 18, 1982, Crismon sent Eppes a letter stating that the terms contained in the January 11 letter were acceptable with the following modifications: 1) one of the lots (lot 7) would be unavailable due to a Department of Energy easement; 2) the covered carport in one unit would be eliminated; 3) first and last month's rent would be due and payable at the time the leases were executed and agreed upon; and 4) rent escalations would become effective on the first day of each lease year without notice. In closing, the letter stated, "Please inform me as to your position regarding the above changes so that we may proceed toward a final agreement in this matter."

On February 18, 1982, Crismon obtained $100,000 in construction financing for lots 6, 7 and 8. On March 22, 1982, Eppes sent Crismon a lease which was signed by Western's director of real estate and facilities construction. The lease included the following provisions:

1) Term—all units would be ready no later than May 1, 1982;

2) Rent—lessor may escalate rent by the lesser of 6% per year or the fair market rental rate for comparable units;

3) Maintenance—lessor shall maintain the units;

---

[1] Western paid rent on the duplexes from January to October, 1982 as follows:

| Date | Paid | Units |
|---|---|---|
| 1/28/82 | $1,080.00 | 2 |
| 2/15/82 | $2,160.00 | 4 |
| 3/16/82 | $2,160.00 | 4 |
| 4/26/82 | $3,240.00 | 6 |
| 4/26/82 | $4,320.00 | 8 |
| 6/22/82 | $1,080.00 | 8 |
| 6/22/82 | $4,320.00 | 8 |
| 8/30/82 | $4,320.00 | 8 |
| (only 3 units were occupied) | | |
| 9/12/82 | $4,320.00 | 8 |
| (only 1 unit was occupied) | | |

4) Insurance—lessor indemnifies lessee to the extent of lessor's insurance coverage; and

5) Default by lessor—if lessor breaches, lessee may either cure the breach and deduct the cost thereof from rent or terminate the lease.

By letter dated April 1, Crismon informed Eppes of his dissatisfaction with that lease and enclosed an unsigned lease which made the following changes in Eppes' proposed lease:

1) Term—eight units would be ready no later than May 1, 1982, but two units would be ready by July 15, 1982;

2) Rent—lessor may escalate rent by 6% per year;

3) Maintenance—lessor shall maintain the units as may be necessary due to ordinary wear and tear but lessee shall pay for all damage caused by negligence of lessee or his employees, agents and tenants;

4) Insurance—lessee indemnifies lessor to the extent of lessee's insurance coverage;

5) Default of lessor—if lessor breaches, lessee may cure and deduct the cost from rent;

6) Cost of default—the defaulting party must pay costs of enforcing the agreement including attorney fees.

On April 25, 1982, Crismon telephoned Eppes because he had not received Western's April rent and because he had not received a response to his most recently proposed lease. The substance of the conversation was disputed at trial, but after the conversation Eppes sent Crismon rent for April and May.

In late June, 1982 Eppes sent Crismon another lease identical to the lease he had sent on March 22 except for an agreed reduction in the number of units rented from ten to eight. Crismon was unable to reach Eppes and learned that Eppes quit his job with Western in late June. Crismon then contacted Paul Weide of Western who informed him by letter dated August 23, 1982, that a lease was being structured. On September 14, 1982, Paul Weide sent Crismon a letter terminating rental of Crismon's duplexes effective October, 1982.

Crismon brought this action alleging that the January 11, 1982 letter confirmed the parties' oral five year lease and that he had commenced construction of the duplexes in reliance on Western's agreement to rent the duplexes. The trial court found that in late December of 1981, the plaintiff entered into negotiations for occupancy of the units by defendant as they were completed and that defendant advised plaintiff, by letter dated January 11, 1982, that defendant would enter into a lease. In addition, the court found that Western subsequently sent Crismon a lease which Crismon rejected. The court concluded that the parties had not entered into a binding lease agreement and accordingly entered judgment against plaintiff.

I.

The first issue is whether the parties entered into a binding lease. Crismon claims that Western's January 11, 1982 letter created a binding commitment to lease which he relied on and accepted. The trial court found that the January 11, 1982 letter set forth the preliminary terms and that both Crismon and Western rejected each other's proposed lease.

The trial court's findings of fact will not be set aside unless clearly erroneous. Utah R.Civ.P. 52(a). Findings are presumed valid and correct so long as there is sufficient support for them in the evidence. *City Electric v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 91 (Utah 1983).

The evidence in this case clearly supports the court's finding that the January 11 letter constituted only preliminary negotiations. Under basic contract law principles, a contract is not formed without a meeting of the minds. *Oberhansley v. Earle*, 572 P.2d 1384, 1386 (Utah 1977). "[C]ontractual mutual assent requires assent by all parties to the same thing in the same sense so that their minds meet as to all the terms." *Cessna Fin. Corp. v. Meyer*, 575 P.2d 1048, 1050 (Utah 1978). Determining whether the specific terms omitted were essential to the agreement requires

an examination of the entire agreement and the circumstances under which the agreement was entered into. *Id.*

In this case, the language in Eppes' January 11 letter indicates that the parties were still negotiating. The letter states that Western's legal department would be sending a prepared lease. That statement indicates that both parties understood that a binding contract would be entered into in the future. Subsequent correspondence between the parties also demonstrates that the January 11 letter evidenced preliminary negotiations. Crismon's February 18 letter states that "[a]t the time that leases are agreed upon and executed, first and last months rental payments will be due and payable to lessor." Crismon also states in the letter, "Please inform me as to your position regarding the above changes so that we may proceed toward a final agreement in this matter." Both of these statements indicate that the parties understood that a binding lease agreement had not been formed. Finally, the subsequent leases exchanged by the parties demonstrate that there was no meeting of the minds. Eppes sent Crismon a lease which Crismon rejected by sending back a lease with different terms with regard to term, rent, maintenance, insurance and default. The parties' exchange of proposed leases clearly demonstrates that they did not have a meeting of the minds as to all of the essential terms of the lease.

## II.

The second issue is whether notwithstanding lack of a binding lease agreement, Western is estopped from denying that a valid lease existed due to Crismon's reliance on the January 11, 1982 letter, and resultant detriment suffered by Crismon.

Crismon's complaint alleges that, in reliance upon Western's agreement to lease the five units, Crismon, at his own expense, commenced construction of the duplexes for Western. At trial, Crismon testified that $100,000 was borrowed on or about February 18, 1982 to complete construction of duplexes on lots 6, 7 and 8.[2] Construction on lots 4 and 5 was ninety percent completed prior to the December 1981 negotiations and there was apparently no claim of detrimental reliance in regard to construction on those lots.[3] Crismon further testified that the $100,000 was borrowed as a result of having received the January 11, 1982 letter from Western. On appeal, Crismon argues that it was error for the trial court not to have found that Crismon justifiably relied on the January 11, 1982 letter as a binding contract, that he borrowed $100,000 solely because of that reliance, and that consequently, Western should be estopped from denying the validity of the January 11, 1982 letter.

The trial court's findings of fact do not specifically refer to Crismon's reliance/estoppel theory, but implicitly reject the theory. After trial, Crismon filed a "motion to reconsider" with supporting memorandum, which reiterated the theory more clearly than had been done at trial. At the hearing on the motion to reconsider, the trial judge again listened to Crismon's arguments that reliance on Western's actions or statements had induced the borrowing so as to estop Western from denying the existence of a lease, and remained unconvinced.

We now consider whether the court correctly concluded that estoppel did not apply. In *Blackhurst v. Transamerica Ins. Co.*, 699 P.2d 688, 691 (Utah 1985), the Utah Supreme Court defined equitable estoppel as "conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct." *Id.* at 691.

---

**2.** It is not clear how much of the borrowed funds was used for construction on lot 7, which was sold by Crismon during the summer of 1982.

**3.** Since the expenditure was for only a portion of the units to be leased, it would seem that estoppel, if justified, might apply only to the units affected. However, the issue of an appropriate remedy based on estoppel was not clearly addressed by the parties, either at trial or on appeal.

Crismon's burden in this case was to convince the trial court that Western's conduct in sending the January 11, 1982 letter reasonably led Crismon to borrow the $100,000, and that this borrowing resulted in a detriment to Crismon in that the lease was not finally consummated and Crismon did not receive the full value of the lease payments. Western argued that Crismon would have obtained the $100,000 loan in any event, with or without the January 11, 1982 letter. The trial court implicitly concluded that it was not reasonable to rely on the letter as a binding agreement, sufficient in and of itself to induce the borrowing. That notion is bolstered by the letter from Crismon dated February 18, 1982, contemporaneous with the borrowing, which sought modification of some of the terms in the January 11 letter. Sending the February letter is inconsistent with a belief that the deal had been finally struck, reasonably justifying acts in reliance thereon, as is rejection of two lease versions proposed by Western.

A finding of equitable estoppel "turns on the facts," *United Am. Life Ins. Co. v. Zions First Nat'l Bank*, 641 P.2d 158, 161 (Utah 1982), and will be invoked only where "the circumstances and conduct were such as would perpetuate a fraud or unfair advantage...." *Kelly v. Richards*, 95 Utah 560, 83 P.2d 731, 734 (1938). In the present case, the trial court, after hearing the evidence, found the borrowing was not in reliance upon Western's acts, and the record sufficiently supports this factual finding. We will defer to the trial court's findings unless they are clearly erroneous or have no support. Utah R.Civ.P. 52(a). *See City Electric v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 91 (Utah 1983).

Affirmed. Costs to respondent.

ORME and BILLINGS, JJ., concur.